### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|     EDGEWATER MEDICAL CENTER, | ) | |
| | ) | Bankruptcy No: 02 B 07378 |
| | ) | |
|     Debtor. | ) | Judge Bruce W. Black |
| | ) | |
| EDGEWATER MEDICAL CENTER, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     vs. | ) | Adversary No: 04 A 02328 |
| | ) | |
| EDGEWATER PROPERTY COMPANY | ) | |
| And | ) | |
| PGR PROPERTIES, INC., | ) | |
| | ) | |
|     Defendants. | ) | |

### Memorandum Opinion

The plaintiff in this adversary proceeding, Northside Operating Company ("NOC"), d.b.a. Edgewater Medical Center ("EMC")[1], seeks recovery from the defendants, Edgewater Property Company ("EPC") and PGR Properties, Inc. ("PGR"),[2] in a ten count complaint relating to actions concerning certain real property known as the "adjacent properties" and an option for the plaintiff to purchase those properties from one of the defendants. This is the third opinion from this court regarding the former Edgewater Hospital which ceased operating in December, 2001. In *Edgewater Medical Center v. Rogan (In re Edgewater Medical Center)*, 332 B.R. 166 (Bankr. N.D. Ill. 2005)

---

[1] Because NOC was doing business as EMC these acronyms are often used to refer to the same entity throughout the pleadings. For simplicity, the court will refer to the debtor as "EMC" throughout the opinion.

[2] Although named as a defendant, no credible evidence was presented against PGR. Therefore, unless otherwise specified all references to a single "defendant" refer only to Edgewater Property Company.

("*Edgewater I*"), this court granted summary judgment in favor of the debtor and against

Peter Rogan and Braddock Management L.P. for breach of fiduciary duty, breach of

contract, and indemnification resulting from a Medicare fraud scheme. Subsequently, in

*Edgewater Medical Center v. Rogan (In re Edgewater Medical Center)*, 344 B.R. 864

(Bankr. N.D. Ill. 2006) ("*Edgewater II*"), this court resolved the question of damages

resulting from the first opinion, ordering forfeiture of approximately $13,000,000 in fees

and services.[3]

This opinion concludes a trial that lasted five weeks and had been actively

defended by Peter Rogan ("Rogan"), the principal of the corporate defendants here, and

his attorneys. After the conclusion of the evidence, Rogan fired his attorneys and

apparently left the country. Without new attorneys to represent the corporate defendants,

they are vulnerable to default judgment.[4] Nevertheless, the court has decided to resolve

the issues on the merits. For the reasons that follow, the court finds in favor of the

defendant on the first seven counts, but the court finds in favor of the plaintiff on the last

three counts. Remedies include specific performance, compensatory and punitive

damages, and the imposition of a constructive trust.

## Jurisdiction

The court has jurisdiction over the parties and the subject matter of this adversary

proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and Internal Operating Procedure

15(a) of the United States District Court for the Northern District of Illinois. This

---

[3] See also, *Dexia Credit Local v. Rogan*, 231 F.R.D. 287 (N.D. Ill. 2005); *United States v. Rogan*, 459 F.
Supp. 2d 692 (N.D. Ill. 2006) (ordering Rogan to pay $64.2 million in damages to the United States.)
[4] It is well settled law that corporations cannot appear *pro se*. See *Scandia Down Corp. v. Euroquilt, Inc.*,
772 F. 2d 1423, 1427 (7th Cir. 1985); *In re Tivoli Gardens*, 1999 WL 984392 (N.D. Ill. 1999); *First
Amendment Found. V. Villiage of Brookfield*, 575 F. Supp. 1207 (N.D. Ill. 1983)

adversary proceeding is a core proceeding under 28 U.S.C. §§ 157 (b)(2) (A), (B), (C)[5], (F), (H), (O). The court has jurisdiction to determine all issues presented herein. Venue is proper pursuant to 28 U.S.C. § 1409(a).

## Facts[6]

Edgewater Hospital was founded in 1929. In 1989 Rogan acquired the assets of Edgewater Hospital for $1 million in cash and assumption of approximately $10 million in liabilities. At that time Rogan created a corporation called Edgewater Operating Company ("EOC"). EOC owned the hospital from 1989 until 1994. Rogan formed EPC in 1988 as a vehicle to receive the Edgewater Hospital real property.

In 1992, Rogan began to negotiate the sale of the operation of Edgewater Hospital and part of the real property to Permian, a 501(c)(3)[7] corporation based in Colorado. In 1993 Rogan and Gross (an agent for Permian) created the 501(c)(3) entity NOC to receive Edgewater Hospital from EOC. Gross also created a for-profit hospital management company called Braddock Management, L.P. ("Braddock") to handle Edgewater Hospital's operations. Rogan and Gross selected all the members of EMC's board. EMC then retained Braddock to manage Edgewater.

In 1994, Rogan and EOC sold EOC and a portion of the real property to EMC. As a result of the sale, EMC owned the hospital operations and the real property on which the hospital was located. The "adjacent properties" consisted of the remainder of the hospital campus and included: the professional office building, the Stern building, the

---

[5] Because both defendants are parties that have filed a claim against debtor's estate, the claims in this adversary are considered "counterclaims" for purposes of section 157(b)(2)(C). See *In re Marshall*, 264 B.R. 609, 628 (C.D. Cal. 2001); *In re Carrington Gardens Assocs.*, 248 B.R. 752, 766-67 (Bankr. E.D. Va. 2000).

[6] The facts recited in this section are undisputed.

[7] 26 U.S.C. § 501 (describing the types of corporations exempt from taxation).

Titus-Haffa building, and the Kadin Memorial Nurse's Residence. As part of the EMC transaction, these properties were retained by EPC, of which Rogan owned 100% at all relevant times. Although EPC retained title to the "adjacent properties," EMC negotiated for, and received, an option to purchase the adjacent properties from EPC.

The option allowed EMC to purchase all of the adjacent properties but not less than all. That is, EMC could not exercise the option to purchase some of the adjacent properties without purchasing the others. At no time did EPC receive any offer to purchase the adjacent properties from a third party. EPC owned the adjacent properties at all relevant times.

Pursuant to the option agreement, if EMC declared its intention to exercise the option, the parties were to attempt to reach an agreement on a sale price. If no agreement could be reached, each party was to hire an independent appraiser to determine the value of the property. EMC never exercised the option, and it expired on December 31, 1998.

Subsequent to entering into the option agreement, EMC entered into a lease agreement with EPC on May 24, 1996, *nunc pro tunc* to January 1, 1996, to lease the adjacent properties.[8] The term of the lease was 10 years, which EMC could extend up to 25 additional years. The lease called for EMC to pay EPC $79,500 per month. The lease also required EMC to pay the property taxes, operating expenses, and insurance premiums. EMC ceased paying rent on or about May 18, 2001. Nothing in the lease prevented EMC from exercising its rights under the option agreement.

---

[8] The lease was essentially an alternative to exercising the option. Much of the conflict in this case centers on these two documents.

### Discussion

### Threshold Issues

#### 1. Transfer

Through count I the plaintiff seeks to avoid a "transfer" of property that it alleges occurred when the option expired without having been exercised. The plaintiff relies on section 544(b)(1) of the Bankruptcy Code[9] which allows a trustee (or debtor in possession) to avoid certain transfers if they are avoidable under applicable law and section 550 which allows recovery of the transferred property. The "applicable law" the plaintiff relies upon is the Illinois Uniform Fraudulent Transfer Act ("UFTA") 740 ILCS 160/5(a)(1). Both sections of the Code cited above, as well as the UFTA, depend on a "transfer" of property having occurred. If no transfer has taken place, there is nothing to avoid or recover. Thus, before it becomes necessary to determine if a transfer was fraudulent or if the debtor in possession has the power to avoid a transfer or to recover the property involved in it, the court must first determine whether a transfer did, in fact, occur. "Under the Code, a 'transfer' is a prerequisite to the trustee's [or debtor in possession's] ability to avoid a fraudulent conveyance and to augment the estate to benefit creditors."[10]

The UFTA defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."[11] Similarly, the Code defines transfer as ". . . every mode, direct

---

[9] 11 U.S.C. § 101 *ff.* Any reference to "section" or "the Code" is a reference to the Bankruptcy Code unless another reference is stated.

[10] *Continental Title Co. v. The People's Gas and Coke Co.*, 1999 WL 753933 at *2.

[11] 740 ILCS § 160/2(1).

or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting

with property or with an interest in property, including retention of title as a security

interest and foreclosure of the debtor's equity of redemption . . . ."[12]

Although the court recognizes that the definition of "transfer" in both the Code

and the UFTA is very broad, the court concludes as a matter of law that it is not so broad

as to encompass EMC's failure to exercise the option. The plaintiff points to cases in

which courts in other districts found that a landlord's wrongful termination of a lease

containing an option to buy was a transfer.[13] Here, however, the lease was not terminated;

the option simply was not exercised and expired. As presented, the issue appears to be

one of first impression in this district, and research on the issue has yielded relatively few

instructive cases from other jurisdictions, and none directly on point. The plaintiff has

not pointed to, and the court cannot find, any cases in which the simple expiration of an

option prior to execution has been considered a transfer. The court agrees with the

following reasoning in *Matter of Jermoo's Inc.*, 38 B.R. 197, 204 (Bkrtcy. Wis. 1984):

> When property, real, tangible, or intangible, is transferred, the property
> itself is not transformed by the exchange. The termination of the right to
> perform on an executory contract, according to the terms of that contract,
> differs from a transfer of property in this sense: the rights terminated,
> unlike property, are transformed. At the option of the terminating party,
> the rights may simply disappear, or as with other kinds of property, may
> be dispersed, reconveyed or retained.

EMC could have exercised the option prior to its expiration on December 31, 1998, but

did not; and when the option lapsed, the right simply disappeared. It was not transferred.

---

[12] 11 U.S.C. § 101(54).
[13] See *e.g. In re Finelli Jewelry Co., Inc.*, 79 B.R. 521 (Bankr. D.R.I. 1987); *In re Queen City Grain, Inc.*, 51 B.R. 722 (Bankr. S.D. Ohio 1985).

Because the plaintiff has failed to meet the threshold requirement of a transfer, count I fails, and the court will not reach the other elements of this count. Accordingly, judgment will be entered in favor of the defendants on count I.

### 2. Insolvency

Counts III, XII[14], and V all require an element of insolvency in order to be successful. Count III seeks to recover the rent and other payments as fraudulent transfers pursuant to 740 ILCS 160/6(a). Count XII seeks to recover the rental payments made under the lease within one year of filing as fraudulent transfers pursuant to 740 ILCS 160/6(b). Count V seeks to recover the same payments as count XII, but as preferences under section 547(b)(4)(A). Without a finding that the debtor was insolvent at the time of the transfers, none of these claims succeed.

The UFTA and the Code define insolvency in essentially the same way. If the debtor's debts outweigh the debtor's assets when fairly valued, the debtor is considered insolvent.[15] Based on the evidence presented at trial, it appears that at the time of the transfers the debtor was solvent. The debtor's assets clearly outweighed the debts.[16] The plaintiff argues that this is not an accurate picture of debtor's financial condition. The plaintiff urges the court to take into account the Medicare fraud that was occurring at the hospital during this period of time.[17] According to the plaintiff's argument, a fair valuation of the debtor, as required by both the UFTA and the Code, will include the Medicare fraud and render the debtor insolvent. Simply put, the plaintiff's theory is that

---

[14] It would appear that count XII is mislabeled as it is out of numerical order. It has been labeled as count XII throughout the proceedings, however, and will not be changed now.

[15] See 740 ILCS 160/3; 11 U.S.C. §101(32).

[16] Based on evidence at trial, EMC was in a strong cash position at the time it was contemplating exercising the option. For example, EMC's cash and investments in the first quarter of 1996 were $16,759,000 and were $29,300,000 at year's end.

[17] That such fraud did indeed take place is undisputed. See *Edgewater I*, 332 B.R. at 171 - 72.

had the Medicare fraud been discovered it would have had devastating financial consequences for the debtor.

The plaintiff presented credible expert witnesses who testified that had the Medicare fraud come to light several things would have occurred, all of which would have been detrimental to the value of the debtor. According to the witnesses, upon discovering the fraud, the Department of Health and Human Services would have ceased making Medicare payments to the debtor; the debtor's reputation would have been significantly harmed; patient admissions would have decreased; and the debtor would have been unable to retain or attract good doctors and staff.[18] If the government had withheld the Medicare payments, according to the expert witness, the debtor would have been insolvent.[19]

The parties point to two different methods of analyzing a company's financial health. The two methods are the "going concern" method and the "liquidation" method. Simply put, the "going concern" method translates into a higher value and is used when a company is not on the verge of collapse. Conversely, the liquidation analysis is used for companies on their financial deathbed. A liquidation analysis results in a lower value. In this case it is not necessary to determine which analysis is appropriate. Under either analysis, if the effect of the Medicare fraud is included, the debtor is insolvent. If the fraud is not included, the debtor is solvent.

"The Bankruptcy Court has broad discretion when considering evidence to support a finding of insolvency." *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)* 78 F. 3d 30, 35 (2d Cir. 1996). "A company's assets must be valued at the time of the

---

[18] Based upon testimony of the plaintiff's expert witness John E. Hartwig.
[19] Based upon testimony of the plaintiff's expert witness Patrick F. McNally.

alleged transfer and not at what they turned out to be worth at some time after the bankruptcy intervened." *In re Coated Sales, Inc.*, 144 B.R. 663, 667 (S.D.N.Y 1992); *see also In re Energy Co-op., Inc.*, 109 B.R. 882, 824 (N.D. Ill. 1989); *Cissell v. First Nat. Bank of Cincinnati*, 476 F. Supp. 474, 484 (S.D. Ohio 1979); *Mutual Savings & Loan Ass'n v. McCants*, 183 F. 2d 423, 425 (4th Cir. 1950). Courts should refrain from using impermissible hindsight when determining fair value. *Coated Sales*, 144 B.R. at 668.

In *Coated Sales*, the court found that the debtor was insolvent, even though it appeared to be solvent at the relevant time, because its insolvency was hidden behind false accounts receivable and other financial misrepresentations. In other words, the company actually was insolvent and only appeared to be in good financial shape due to falsified financial records.

The case at bar is easily distinguishable from *Coated Sales*. In that case the debtor was actually insolvent. It only *appeared* to be solvent because it was "cooking the books." In the case at bar, the debtor *might* have been rendered insolvent *if* the Medicare fraud had been uncovered. There was no "cooking of the books." One did not need to incorporate any hypothetical fines, penalties, or cessation of payments to render the debtor in *Coated Sales* insolvent. But that is exactly what the plaintiff is asking the court to do here. Had the government discovered the Medicare fraud that was occurring and had the government completely ceased making payments to the debtor, then perhaps the debtor would have been rendered insolvent. Perhaps that is what would have happened; perhaps that is even what *likely* would have happened. To reach a finding of insolvency, however, the court would have to disregard the large amounts of cash the debtor had on hand and *speculate* on what the Department of Human Services would have done if it had

9

discovered the Medicare fraud. The court declines to engage in that type of speculation and finds and concludes that the plaintiff has not met its burden of proving insolvency.

Because a finding of insolvency is a necessary element in each of counts III, XII, and V, and because that element was not proved, the court will not reach any of the other elements in these counts. For this reason counts III, XII, and V fail, and judgment will be entered in favor of the defendants on these counts.

**Remaining Issues**

*1. Counts II and IV: Fraudulent Transfer—Actual Fraud*

Count II alleges a fraudulent transfer cause of action based on actual fraud, pursuant to section 544 of the Code and section 160/5(a)(1) of the UFTA. Count IV alleges actual fraud under section 548(a)(1)(A) of the Code. Unlike count I, the threshold element regarding the existence of a transfer is easily met regarding counts II and IV. The debtor transferred money to the defendant regularly as rent payments pursuant to the lease agreement. Having concluded that transfers did occur, the court looks to 740 ILCS 160/5(a) which reads in relevant part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a
> creditor, whether the creditor's claim arose before or after the transfer was
> made or the obligation was incurred, if the debtor made the transfer or
> incurred the obligation: (1) with actual intent to hinder, delay, or defraud
> any creditor of the debtor . . .

Similarly, section 548(a)(1)(A) of the Code requires the "actual intent to hinder, delay, or defraud." To prevail on these counts, the plaintiff must prove[20] that the

---

[20] The quantum of proof required to prove actual fraud under 740 ILCS 160/5(a) is not well settled. See *In re Zeigler*, 320 B.R. 372, 374 (Bankr. N.D. Ill. 2005) (requiring clear and convincing proof); *In re Hennings Feed and Crop Care, Inc.*, 365 B.R. 868, 874 (Bankr. C.D. Ill. 2007) (same). But see *In re McCook Metals, L.L.C.* 319 B.R. 570, 587 (Bankr. N.D. Ill. 2005) (standard is not necessarily clear and convincing). Because the plaintiff does not meet the lower standard of preponderance of evidence, the court will not reach the issue of whether actual fraud requires a clear and convincing standard.

defendant caused the debtor to make the transfers with actual intent to defraud a creditor of the debtor. Because proving actual intent to defraud is often difficult, the UFTA provides 11 enumerated "badges of fraud" that a court may consider when determining whether actual intent exists.[21] The plaintiff points to several badges of fraud to support its position.[22] Although the plaintiff's position is far from frivolous, the fact remains that the transfers in question consisted of payments required by the lease. Despite the presence of several of the badges of fraud, the court is unable to find or conclude that the transfers were made with the actual intent to defraud creditors. Because the transfers in question consisted of lease payments, failure to make the transfers would constitute a default under the lease, and the debtor would have been subject to negative consequences such as eviction.

The "badges of fraud" are meant to help a court in determining whether a transfer was fraudulent. The "badges of fraud" are not persuasive in this case because there is a plausible non-fraudulent explanation for the transfers. The court finds and concludes that the transfers were not made with the intent to hinder, delay, or defraud any creditor of the debtor. The transfers were necessary to maintain possession of the property and stay in business. Accordingly, judgment will be entered in favor of the defendants on counts II and IV.

---

[21] 740 ILCS 160/5(b)(1)-(11).

[22] The "badges" that the plaintiff points to are: 1) Rogan was an insider; 2) Rogan withheld and misrepresented facts relating to the transfer; 3) EMC had been threatened with a lawsuit prior to the transfer; 4) EMC removed assets from EMC and transferred those assets to Permian; 5) the value EMC received was not reasonably equivalent to the value of the option; 6) EMC was insolvent at the time of the transfer; 7) the transfer occurred at the time debtor incurred a substantial debt.

### 2. Count VI—Disallowance of Claims

The plaintiff is seeking disallowance, pursuant to section 502(d), of various claims and counterclaims made by EPC against the bankruptcy estate.[23]   Section 502(d) states, in pertinent part:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title . . . unless such entity . . . had paid the amount, or turned over any such property, for which such entity . . . is liable under section . . . 550 . . . of this title.

Because, as discussed above, the court has determined that there is no property recoverable under section 550, none of the defendants' claims will be disallowed pursuant to section 502(d), and judgment will be entered in favor of the defendants on count VI.

### 3. Count VII—Breach of Contract

To prevail on its claim for breach of contract under Illinois Law,[24] the plaintiff must show, by a preponderance of the evidence, that: 1) a valid contract existed between EMC and EPC; 2) EPC breached that contract; 3) EMC substantially preformed its obligation under the contract; and 4) EPC's breach damaged EMC.  *Van Der Molen v. Washington Mut. Finance, Inc.*, 359 Ill. App. 3d 813, 823, 835 N.E.2d 61, 69 (1st Dist. 2005).  It is undisputed that the option was a valid contract between EPC and EMC. Therefore, the court will start with the second element: whether EPC breached the contract.

---

[23] EPC has made the following claims against the estate: (a) a counter claim it brought in this case for which it seeks approximately $435,000; (b) a counterclaim in a related adversary case #03 A 04843, in which EPC seeks approximately $354,626 (EPC counterclaim at 27 (Docket # 11)); (c) $2000 this court awarded EPC on August 14, 2003 in connection with EPC's administrative rent claim (case # 02 B 7378 (Docket # 552)); (d) approximately $2,934,684.10 sought via the proof of claim filed in this case (Claim # 255).

[24] Illinois law controls by agreement of the parties in paragraph 13 of the option.

*a. Breach*

Under Illinois law the option contract, as well as all other contracts, carried with it an implied covenant of "good faith and fair dealing."[25] This covenant required both parties to refrain from doing anything to destroy or injure the other's right to receive the benefit of the contract.[26] The plaintiff argues that EPC, through its agents,[27] breached this covenant by taking actions that caused EMC to fail to exercise the option. At trial, the plaintiff presented convincing evidence showing that EPC took various steps to prevent EMC from exercising the option, including: 1) concealing critical information relating to the valuation of the adjacent properties and the benefit to EMC if the option were exercised;[28] 2) causing inaccurate and overvalued appraisals to be prepared and presented to EMC; 3) influencing EMC's board into continuing to lease rather than exercise the option to buy by representing that a full analysis of the buy versus lease decision was complete when, in fact, it was not; and 4) further manipulating the board into believing that the appraisals were commissioned by Henry Zeisel when they were not. The list of inappropriate behavior by Rogan and those under his control is long and need not be spelled here in detail.[29] The evidence of actions taken relating to the appraisals and the inappropriate insider dealings with the EMC board is sufficient for the plaintiff to meet its burden on this issue.

---

[25] See *Spiroff v. Spiroff*, 74 Ill. App. 3d 119, 392 N.E.2d 363 (1st Dist. 1979); *Vincent v. Doebert*, 183 Ill. App. 3d 1081, 1090, 539 N.E.2d 856, 862 (2nd Dist. 1989).

[26] See *Photovest Corp. v. Fotomat Corp.*, 606 F. 2d 704, 729 (7th Cir. 1979).

[27] Specifically Rogan, Tatooles, and Miller.

[28] The information withheld includes the REAC appraisal, the Starkman appraisal, and EPC's sales analysis.

[29] The evidence at trial showed conclusively that Rogan acted in his own self interest at every opportunity, without care or thought for his fiduciary duty towards EMC. Rogan even went so far as to claim on the stand that as CEO of EMC he owed no fiduciary duty towards EMC because he was not *actually* an officer of the company.

The EMC board asked Rogan to obtain appraisals of the adjacent properties to use in making its decision whether to exercise the option. At that time, Rogan was already in possession of the REAC appraisals and the Starkman appraisals which valued the adjacent properties *and* the rest of the hospital campus at approximately $2.75 million. The REAC appraisal even allocated values for each individual parcel. The value allocated to the adjacent properties in the REAC appraisal was approximately $559,000. Several of the directors testified that they would have considered this information valuable in determining whether to exercise the option.

Instead of disclosing the existing appraisals, Rogan had Zeisel retain two specific appraisal firms and instruct those firms to make the appraisals based on assumptions which artificially inflated the value of the adjacent properties.[30] Rogan led Zeisel to believe that Rogan was passing along the wishes of the EMC board, when, in fact, Rogan was making all of the decisions regarding the appraisals.

By withholding key information and manipulating the EMC board, Rogan and those under his control breached the covenant of good faith and fair dealing.

### b. Substantial Performance

Under Illinois law a party asserting a cause of action for breach of contract must demonstrate its own performance or an excuse for non-performance. *In re Kids Creek Partners, L.P.*, 212 B.R. 898, 933 (Bankr. N.D. Ill. 1997). Non-performance of one party is excused when that performance is prevented by the actions of the other party. "A party

---

[30] The appraisals were done on an individual parcel by parcel basis, even though the option could only be exercised on all of the adjacent property as a whole. By appraising the adjacent properties individually, the overall total value was increased. The appraisals included fair rent valuations that did not take into account the limited use of the contemplated lease. This also caused the value to increase. The result of these manipulations was to cause the appraisals to value the adjacent properties at approximately $6 million, significantly more than the $2.75 million the previous appraisals had valued the *entire* hospital campus.

who deliberately prevents the fulfillment of a condition on which his liability under a contract depends cannot take advantage of his own conduct and claim that the failure of the fulfillment of the condition defeats his liability." *Yale Dev. Co., Inc. v. Oak Park Trust & Sav. Bank*, 26 Ill. App. 3d 1015, 1020, 325 N.E.2d 418, 422 (2nd Dist. 1975). When one party to a contract can show that the other party prevented his performance, it is to be taken as true that he would have performed if he had not been prevented from doing so. *Levy & Hipple Motor Co. v. City Motor Cab Co.*, 174 Ill. App. 20 (1st Dist. 1912).

In the case at bar, although EMC failed to exercise the option within the allowable time frame, this failure to perform is excused because it was caused by EPC. As discussed above, EPC (through its agents—Rogan and those under his control) prevented EMC from exercising the option. Because its performance was prevented by the other party to the contract, EMC's failure to exercise the option within the allotted time frame is excused.

### c. Injury

Based on the testimony at trial, it is readily apparent that exercising the option would have been a better business decision. If not for the breach of the covenant of good faith and fair dealing, EMC presumably would have exercised the option. EMC suffered economic loss by continuing to lease the property instead of exercising the option. Accordingly, the court concludes that the plaintiff has met its burden of proving the necessary elements of count VII. The appropriate remedies will be discussed below.

### 4. Count VIII—Breach of Fiduciary Duty[31]

To prevail on its claim of breach of fiduciary duty, the plaintiff must show that: 1) there existed a fiduciary duty; 2) that duty was breached; and 3) an injury resulted from the breach. *Petri v. Gatlin*, 997 F. Supp. 956, 977 (N.D. Ill. 1997).

#### a. Existence of a Fiduciary Duty

Rogan testified that he was not a fiduciary of EMC because he was only an officer by operation of his employment at the management company Braddock. He also argues that he was not a fiduciary because the by-laws of EMC do not specifically include his position of CEO among the list of officers. The court finds these arguments to be completely without merit. It is undisputed that Rogan was CEO of EMC. As *Chief Executive Officer* he was clearly an officer of the company and thus owed a fiduciary duty to EMC. *Shlensky v. South Parkway Building Corp.*, 19 Ill. 2d 268, 278, 166 N.E.2d 793, 799 (1960). Rogan attended and ran board meetings and took on other responsibilities of a CEO. The court finds untenable the position that Rogan was only, somehow, *technically* CEO and that he was not required to act in the best interest of EMC. The court finds and concludes that a fiduciary duty existed between Rogan and EMC.

#### b. Breach of fiduciary duty

Although it is normally the plaintiff's burden to establish this element, a presumption of fraud arises when a fiduciary benefits in a transaction with his principal. *CSFM Corp. v. Elbert & McKee Co.*, 870 F. Supp. 819, 834 (N.D. Ill. 1994). As

---

[31] Because Rogan was an agent for EMC and EPC, and because EPC directly benefited from Rogan's breach of his fiduciary duty, Rogan's actions are imputed to EPC. Rogan owned 100% of EPC at all relevant times and therefore EPC will not be allowed to profit from Rogan's breach of fiduciary duty to EMC.

discussed above, Rogan was a fiduciary of EMC, and EPC (and Rogan) benefited by EMC's failure to exercise the option. Therefore, the burden shifts to the defendant to demonstrate that there was no fraud or bad faith. "Where the existence of a fiduciary relation is established, the law presumes that any transaction between the parties by which the fiduciary has profited, is fraudulent. The burden rests on the fiduciary to overcome the presumption by clear and convincing proof that he has exercised good faith." *Mile-O-Mo Fishing Club, Inc. v. Noble*, 62 Ill. App. 2d 50, 57, 210 N.E.2d 12, 16 (5th Dist. 1965).

That Rogan benefited by EMC's failure to exercise the option is clear. EPC (and thus Rogan) maintained ownership of the adjacent properties and continued to receive the excessive rent (as well as the taxes and maintenance costs) from EMC.

Far from demonstrating his good faith by clear and convincing proof, Rogan demonstrated no evidence at all of good faith. Rogan exhibited no concern for EMC's interest. In fact, Rogan testified that he *did not even think he had* a fiduciary duty toward EMC. For the reasons discussed above regarding Rogan's breach of the covenant of good faith and fair dealing, the court finds that the defendant has failed to rebut the presumption of fraud. Therefore, the plaintiff has satisfied its burden of proving this element.

### c. Injury

The third element is an injury resulting from the breach of the fiduciary duty. As discussed above regarding count VII, EMC was damaged by failing to exercise the option and instead continuing to pay excessive rent (and taxes and maintenance) to EPC.

17

Accordingly, the court concludes that the plaintiff has proved count VIII. The appropriate remedy of damages will be discussed below.

### 5. Count IX—Unjust Enrichment

To prevail on count IX, the plaintiff must demonstrate that EPC unjustly retained benefits to the detriment of EMC and that retaining these benefits violated fundamental principles of justice, equity, and good conscience. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989). It is clear from the preceding discussion that EPC retained a benefit to the detriment of EMC. By causing EMC to not exercise the option, EPC retained title to the adjacent properties and continued to receive rent, tax and maintenance payments from EMC. If the option had been exercised, EMC would have gained title to the properties, would no longer have had to pay rent, and any tax and maintenance payments would have benefited its own property.

The plaintiff must also show that retention of those benefits violates fundamental principles of justice, equity, and good conscience. When there is overwhelming evidence of intentional wrongdoing on the part of the party retaining the benefits, such as we have in this case, this element is satisfied. "Any profit realized in consequence of intentional wrongdoing is unjust enrichment because it results from a wrong to the plaintiff. It is unjust enrichment because it results from a transfer to the defendant, direct or indirect, that lacks an adequate legal basis." Restatement (Third) of Restitution & Unjust Enrichment §3 (D.D., 2000). Allowing EPC or Rogan to profit from the actions in causing the EMC board to fail to exercise the option, as discussed above, would violate the fundamental principles of justice, equity, and good conscience. Therefore, the court

concludes that the plaintiff has met its burden of proving the elements of count IX. The appropriate remedy will be discussed below.

### 6. EPC's Counterclaim

At a hearing on or about July 27, 2001, Judge Garber of the Circuit Court of Cook County, Illinois, ordered EMC to pay monthly use and occupancy fees in the amount of $96,752 plus one-half of the property taxes into an escrow account. On May 9, 2002, this court ordered all funds held in the escrow account turned over to the debtor and ordered the debtor hold these funds in a segregated interest bearing account.[32] EPC has filed a counterclaim here requesting that the approximately $435,000 held in this account be released to EPC. In support of its claim, EPC points to a pre-petition order from Judge Garber ordering release of the escrowed funds to EPC. The effective date of this order was post-petition, however, and therefore the order was superseded by EMC's filing for bankruptcy protection.

As discussed below, EPC is not entitled to any rent payments after December 31, 1998. Accordingly, the defendant's counterclaim fails and judgment will be entered for the plaintiff and counter-defendant, EMC.

### Remedies

### 1. Specific Performance

In Illinois, an option to purchase real estate given under a lease is enforceable by specific performance. *Bonde v. Weber*, 6 Ill. 2d 365, 380, 128 N.E.2d 883, 891 (1955). Specific performance is appropriate even in cases where the optionee did not exercise the option prior to its expiration if the failure to exercise was caused by the optionor. *Phillips v. McCullough*, 278 Ill. App. 3d 442, 450-51, 663 N.E.2d 47, 53 (2d Dist. 1996).

---

[32] Order dated May 9, 2002 (case # 02B07378, docket # 168).

In the case at bar, it was the actions of Rogan and EPC that directly caused EMC not to exercise the option. The court finds that, if not for the deceptive actions of Rogan and EPC described above, EMC would have exercised the option. Moreover, the plaintiff has no adequate remedy at law. Accordingly, pursuant to count VII, the court grants specific performance of the option to EMC.

Having decided the EMC is entitled to specifically perform the option, the court must now determine the purchase price for the "adjacent properties." As a court of equity, the court is empowered to determine a purchase price.

> Equity courts are not bound by rigid formulas governing specific actions, rather they are more concerned with balancing the hardships and equities presented by each unique set of circumstances. It is well established that courts of equity have great flexibility in determining appropriate relief in actions before them and may shape remedies to meet the demands of justice in each case, however peculiar.

*Davis v. Kurtz*, 165 Ill. App.3d 417,421, 518 N.E.2d 1297, 1300 (3d Dist. 1988). Courts have used that power to set a purchase price for real property. *Tobey Furniture Co. v. Rowe*, 18 Ill. App. 293 (1st Dist. 1885); *Miller v. Bloomberg*, 26 Ill. App. 3d 18, 324 N.E.2d 207 (2d Dist. 1975).

Had the option been exercised without an agreement on price, both parties would have obtained an appraisal and then the average of the appraisals would have been the sale price. Of all the appraisals discussed in the evidence, the court finds that the most helpful appraisal is the 1994 REAC appraisal. However, recognizing the inexact science in determining what would have been the market price for a property many years ago, the court will make an adjustment in favor of the defendant. The REAC appraisal valued the entire hospital campus at $2,750,000. Rogan represented to the taxing authorities that this appraisal was an accurate value. The appraisal valued the "adjacent properties" at

only $559,000. In order to be fair, this court will set the option price for the "adjacent properties" at $1,000,000.

Accordingly, this court holds that fee simple title to the "adjacent properties" will be transferred to EMC at the price of $1,000,000. This purchase price will be offset against the compensatory damages awarded to EMC, as discussed below.

### 2. Compensatory Damages

In addition to specific performance of the option and transfer of title to the "adjacent properties" to EMC, EMC is also entitled to recover the rents wrongfully paid to EPC. In *Schwinder v. Austin Bank*, 348 Ill. App. 3d 461, 809 N.E.2d 180 (1 Dist. 2004) the court granted specific performance as well as a monetary award equal to the rent paid by the plaintiffs. "Based upon equitable principles of law, the objective is to put the parties in the position they would have been had the contract been properly executed. If the closing had occurred in August 1987, as was intended under the terms of the contract, Artful Dodger . . . would have been entitled to all rent payments . . . and would not have been paying rent . . . ." *Artful Dodger Pub, Inc. v. Koch*, 230 Ill. App. 3d 806, 811, 596 N.E.2d 39, 42 (1st Dist. 1992). Likewise, had EMC exercised the option, it would not have paid rent to EPC. Therefore, EMC is entitled to a return of all rent[33] paid to EPC after the option would have been exercised. For sake of this calculation, the court will give the benefit of the doubt to the defendant and use the expiration date of the option as the exercise date. That is, the court will treat December 31, 1998, as the date

---

[33] Because the lease agreement between EMC and EPC called for EMC to pay rent on a "triple-net" basis, included in the rent payments were amounts for upkeep, taxes, and other expenses that EMC would have been responsible for as owner in fee simple. Therefore, these amounts will not be included in the amount recovered by EMC.

that the option was exercised. Any rent paid to EPC by EMC after December 31, 1998, is recoverable by EMC.

From December 31, 1998, until the petition date, EMC paid $2,375,659.40 in rent[34] to EPC. As stated above, EMC is also entitled to the approximately $435,000 currently held by the debtor in the segregated account. The total amount of compensatory damages EMC is entitled to is $2,810,657.40.[35]

### 3. Punitive Damages

Illinois courts have recognized that punitive damages are appropriate to punish the individual responsible for wrongful conduct, and to deter others from engaging in similar conduct. *Page v. City of Chicago*, 299 Ill. App.3d 450, 463, 701 N.E.2d 218, 227 (1st Dist. 1998). When, as here, the wrongful conduct is a breach of fiduciary duty, punitive damages can be appropriate. *In re Estate of Wernick*, 127 Ill. 2d 61, 85, 535 N.E.2d 876, 887 (1989). Punitive damages are not appropriate for simple negligence, but only to punish willful conduct that is outrageous or done with an evil motive. The evidence has shown that Rogan breached his fiduciary duty to EMC, and that he did so willfully, with the intent to defraud EMC. This is exactly the type of conduct for which punitive damages are appropriate.

Based on the clear evidence of Rogan's wrongful conduct, pursuant to count VIII, the court awards punitive damages to EMC in an amount equal to the compensatory damages. This amount is well within the "guidelines" set in *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003). The Court in *State Farm* opined that punitive damages in the amount "four times the amount of compensatory damages

---

[34] This amount was stipulated to by the parties. (Pre-Trial Order Submission at ¶ 98).
[35] EMC is also entitled to any additional interest held in the segregated account.

might be close to the line of constitutional impropriety." *Id* at 425. Considering the nature of the conduct in this case, the court is well within its power to award a 1 to 1 ratio of compensatory to punitive damages.

### 4. Constructive Trust

As an alternative remedy in addition to specific performance ordered pursuant to count VII, the court finds that a constructive trust should be imposed pursuant to counts VIII and IX. Under Illinois law a constructive trust arises by operation of law if a court finds that it would be inequitable for the legal owner of property to enjoy the beneficial interest. *Taino v. Sanchez*, 147 Ill.App. 3d 871, 874, 498 N.E.2d 571, 573 (1st Dist. 1986). A constructive trust is appropriately imposed in instances where one party has breached its fiduciary duty. *Suttles v. Vogel*, 126 Ill. 2d 186, 193, 533 N.E.2d 901, 904 (1988); *First Fed. Sav. of Hegewisch v. Orchowski*, 1993 WL 433811 at *2 (N.D. Ill. 1993). A constructive trust is also appropriately imposed in cases of unjust enrichment. *Peddinghaus v. Peddinghaus*, 295 Ill. App. 3d 943, 949-50, 692 N.E.2d 1221, 1225-26 (1st Dist. 1998); *Metropulos v. Chicago Art Glass, Inc.*, 156 Ill. App. 3d 727, 736, 509 N.E.2d 1068, 1074 (2d Dist. 1987). In cases where the defendant has unjustly enriched himself by breaching his fiduciary duty, as is the case here, imposing a constructive trust is especially appropriate. *Steinberg v. Chicago Medical Sch.*, 69 Ill. 2d 320, 327, 371 N.E.2d 634, 638 (1977).

The court finds that the defendant unjustly retained title to the "adjacent properties" as a result of Rogan's breach of his fiduciary duty to EMC. Principles of equity and justice require that a constructive trust be created for the benefit of EMC to reach the "adjacent properties." Accordingly, pursuant to counts VIII and IX, the court

declares that the "adjacent properties" are constructively held in trust for the benefit of

the plaintiff. Further, the court orders that the trust be terminated by fee simple title

being transferred to the plaintiff.

### 5. Interest, Attorney Fees, and Costs

In addition to the compensatory and punitive damages discussed above, the

plaintiff seeks both pre-judgment and post-judgment interest as well as attorney fees and

costs.

### a. Pre-Judgment Interest

The court has discretion to award pre-judgment interest.[36]   The usual reasoning

behind awarding pre-judgment interest is to compensate the plaintiff for the loss of use of

the property while it was wrongfully held by the defendant. In the case at bar, the

plaintiff had possession of the "adjacent properties" throughout the proceedings. In light

of this, and because the plaintiff ceased operating in 2001, the court awards no pre-

judgment interest.

### b. Post-Judgment Interest

Post-judgment interest is allowed by federal law. Post-judgment interest is

governed by 28 U.S.C. §1961(a) which calculates post-judgment interest rate "from the

date of entry of the judgment, at a rate equal to the weekly average 1-year constant

maturity Treasury yield, as published by the Board of Governors of the Federal Reserve

System, for the calendar week preceding the date of the judgment." The court anticipates

that EMC may have difficulty enforcing its judgment against EPC and will grant post-

judgment interest to EMC at the rate prescribed by 28 U.S.C. §1961(a).

---

[36] The plaintiff argues that pre-judgment interest is "presumptively available to victims of federal law violations." *Gorenstein Enterprises, Inc. v. Quality Care-Usa, Inc.*, 874 F. 2d 431, 436 (7th Cir. 1989). Because the plaintiff has prevailed only on state law causes of action, no such presumption arises here.

### c. Attorney Fees

Attorney fees are normally not awarded to the prevailing party. The plaintiff is

seeking attorney fees in this case pursuant to a lease provision. Paragraph 28 of the lease

states:

> If either party shall bring any action or legal proceeding for damages for
> an alleged breach of any provisions of this Lease, to recover rent or other
> sums due, to terminate the tenancy of the Premises or to enforce, protect
> or to establish any term, condition or covenant of this Lease or right of
> either party, the prevailing party shall be entitled to recover, as a part of
> the action or proceedings, or in a separate action brought for that purpose,
> reasonable attorney's fees and court costs as may be fixed by the court or
> jury. The prevailing party shall be the party which secures a final
> judgment in its favor.

The court must construe such provisions strictly. *Erlenbush v. Largent*, 353 Ill.

App. 3d 949, 951, 819 N.E.2d 1186, 1189 (4 Dist. 2004). The court has doubts about

whether EMC is a "prevailing party" since the court found for the defendant in a majority

of the counts. In addition, no provisions of the lease were breached. Although this

adversary concerned the leased property, a significant portion of the litigation concerned

the option agreement. The primary issue in this case was whether to exercise the option

or continue to lease. It did not so much concern a specific provision of the lease but

rather the lease as a whole as an alternative to the option. The court finds and concludes

that is not sufficient to trigger the fee shifting provision. Each party will bear its own

attorney fees arising from this proceeding.

### d. Costs

Federal Rule of Bankruptcy Procedure 7054(b) leaves the issue of costs to the

discretion of the court. Given the question regarding which party is "prevailing," the

court concludes that each party should bear its own costs.

## Conclusion

To summarize, the court orders specific performance of the option for $1,000,000. This amount is offset against the award of compensatory damages in the amount of $2,810,657.40. The net amount of compensatory damages awarded to EMC is $1,810,657.40 plus any additional interest in the segregated account. Of the $1,810,657.40, approximately $435,000 is currently held by the debtor in the segregated account, meaning that the total amount of compensatory damages outstanding is $1,375,657.40. The court also awards an additional $2,810,657 in punitive damages to EMC. This brings the total amount of monetary damages EPC must tender to EMC to $4,186,314.40. The amount will bear post-judgment interest according to law. The court declines to award the plaintiff pre-judgment interest, attorney fees, or costs.

This Memorandum Opinion will serve as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. A separate judgment reflecting the decisions herein will be entered pursuant to Federal Rule of Bankruptcy Procedure 9021. Further, it is the court's intention to resolve all matters in this adversary proceeding with this opinion, and the court directs entry of final judgment and determines that there is no just reason to delay appeal from this judgment.

DATED: August 15, 2007                    ENTERED:


Bruce W. Black
Bankruptcy Judge